**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD PRIEBE, | ) | CASE NO. 1:15-CV-734 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Richard Priebe ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423. ("Act").  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).   This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On April 21, 2009, Plaintiff filed his application for POD and DIB, alleging a

disability onset date of January 11, 2004. (Transcript ("Tr.") 47.)  The application was

denied initially, upon reconsideration, and in a decision issue by an administrative law

judge ("ALJ") on September 23, 2011. (*Id.*)  On January 28, 2013, the Appeals Council

remanded the decision for further administrative proceedings. (*Id.*)  On September 11,

2013, an ALJ held a hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented

by counsel, and testified. (*Id.*)  A vocational expert ("VE") also participated and testified. (*Id.*)  On October 9, 2013, the ALJ found Plaintiff not disabled. (Tr. 47-57.)  On February 20, 2015, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 12.)  On April 16, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 15, 17.)

Plaintiff asserts the following assignments of error: (1) the ALJ failed to give appropriate weight to the opinions of Plaintiff's treating physicians, and (2) the ALJ erred in determining Plaintiff's residual functional capacity ("RFC").

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born in April 1950 and was 53-years-old on the alleged onset date. (Tr. 56.)  Plaintiff subsequently changed age category to advanced age. (*Id.*)  He had at least a high school education and was able to communicate in English. (*Id.*)  Plaintiff has past relevant work as a manager, sales manager, building material sales attendant, and department manager. (*Id.*)

### B.   Medical Evidence

#### 1.   Medical Reports

##### a.  Physical Impairments

In 1992, Plaintiff was in a motor vehicle accident. (Tr. 862.)  Plaintiff suffered multiple skull fractures when the driver of the other vehicle assaulted him after the accident. (*Id.*)  Plaintiff fell into a coma for two days and was hospitalized for ten days.

2

(*Id.*)  Thereafter, Plaintiff complained of severe vertigo, temper issues, and difficulty completing tasks. (*Id.*)  In 1994, Plaintiff was diagnosed with post-traumatic vertigo. (Tr. 501.)  A 2003 CT scan of Plaintiff's brain was normal. (Tr. 522.)

In November 2005, Plaintiff was involved in an accident while working as a carpenter. (Tr. 659.)  Plaintiff "turned the wrong way," causing pain in his neck and upper thoracic area that ran into his right posterior scapular region. (*Id.*)  A November 2005 x-ray of Plaintiff's thoracic spine showed no fracture or dislocation, but indicated advanced discogenic degenerative changes in the thoracic spine. (Tr. 632.)

Plaintiff treated with primary care physician Eric Yasinow, M.D., for back pain in December 2005. (Tr. 507.)  Dr. Yasinow noted tenderness in the right paraspinal muscles. (*Id.*)  Later that month, Dr. Yasinow reported that Plaintiff's back pain had "incompletely responded" to nonsteroidal anti-inflammatory drugs, physical therapy, and muscle relaxants. (Tr. 683.)  Dr. Yasinow recommended masotherapy. (*Id.*)

On January 5, 2006, Plaintiff presented to spine surgeon Nicholas Ahn, M.D., and his nurogenic examination was essentially normal. (Tr. 659).  Plaintiff had excellent strength and normal sensation in his upper and lower extremities. (*Id.*)  His gait and nerve signs were normal. (*Id.*)  Dr. Ahn noted that x-rays taken that day showed some degenerative changes at C6-C7, but there was no evidence of instability. (*Id.*)  Dr. Ahn ordered an MRI of Plaintiff's cervical spine and recommended physical therapy. (*Id.*)  Because Plaintiff's pain was not neurogenic and did not radiate into his upper extremities, Dr. Ahn opined that conservative treatment would likely be appropriate (*Id.*)

On January 31, 2006, Plaintiff presented to the emergency room after he

3

became slightly dizzy and fell, striking his forehead on the edge of a car door. (Tr. 618.)
Plaintiff had not lost consciousness, and aside from minor abrasions on his forehead,
had no other injuries. (*Id.*)  Plaintiff told the attending physician that he felt well and
wished to be released as soon as possible. (*Id.*)  He reported a 17-year history of
chronic vertigo, but that his condition had stabilized over the past seven years, aside
from vertigo attacks similar to the attack he experienced that day. (*Id.*)  Plaintiff denied
cardiac symptoms, neurological deficits, dizziness, and nausea. (*Id*.)  The attending
physician noted that the CAT scan of Plaintiff's head taken that day was negative,
Plaintiff's recent MRI showed that the degenerative joint disease in his cervical spine
did not require surgery, and that Plaintiff was participating in physical therapy for his
cervical osteoarthritis with fairly good results. (Tr. 618.)  Plaintiff's physical examination
revealed no abnormalities. (Tr. 618-19.) The physician diagnosed chronic, recurrent
vertigo and labyrinthitis. (Tr. 619.)

Plaintiff initiated treatment with neurologist Alan Lerner, M.D., on December 5,
2006, for cognitive and personality changes related to his 1992 head injury. (Tr. 528.)
Plaintiff was concerned that he suffered from persistent post-concussive personality
changes, though he had difficulty explaining the nature of his personality change. (*Id.*)
At the time of the examination, Plaintiff was working full time. (*Id.*)  He had performed
well in several different careers, but was unable to continue those positions due to
episodes of verbal aggression. (*Id.*)  Plaintiff complained of falling, stumbling,
headaches, memory problems, and behavioral difficulties, particularly involving a lack of
self-control. (*Id.*)  On physical examination, Plaintiff's gait, strength, and sensation were

4

normal. (Tr. 529.)  Dr. Lerner diagnosed possible persistent post-concussive syndrome with inattention and some degree of emotional dysregulation. (*Id.*)

Plaintiff underwent an MRI of the cervical spine in January 2006. (Tr. 521.)  The image showed a mild disc bulge at C3-C4 and degenerative changes at C6-C7. (*Id.*)

On November 12, 2008, Plaintiff returned to Dr. Lerner. (Tr. 672.)  Plaintiff lasted treated with Dr. Lerner in 2006. (*Id.*)  Dr. Lerner noted that Plaintiff was pleasant but tended to tell somewhat dramatic stories. (*Id.*)  The doctor opined that Plaintiff could benefit from neuropsychological testing and referred Plaintiff to Phil Fasteneau, Ph.D., for an evaluation of his traumatic brain injury. (*Id.*)

Dr. Lerner completed a medical questionnaire discussing Plaintiff's impairments on June 20, 2009. (Tr. 789-96.)  Dr. Lerner last treated Plaintiff in November 2008 and indicated that Plaintiff's diagnoses included post-concussion syndrome, post-traumatic stress disorder ("PTSD"), depression, hypertension, headaches, and memory loss. (Tr. 789.)  The doctor opined that Plaintiff: (1) could sit for three hours and stand or walk for one hour in an eight-hour workday, (2) needed to get up and move around for three to five minutes every fifteen minutes, (3) could frequently lift and carry up to 20 pounds and occasionally lift and carry up to 50 pounds, (4) needed to avoid heights, (5) required a low stress work environment because he had a "low frustration threshold for verbal outbursts," and (6) would miss work about once per month. (Tr. 791-95.)

In October 2009, Plaintiff was hospitalized for several days to determine if he had epilepsy. (Tr. 823, 827.)  On admission, Plaintiff's diagnoses were listed as convulsions, demyelination, hypertension, sleep apnea, restless leg syndrome, memory loss, dizziness, giddiness, and depressive disorder. (Tr. 823.)  Plaintiff's neurological

5

examination was generally unremarkable, aside from mild weakness in the left hip flexor. (Tr. 829.)  Testing indicated that Plaintiff may suffer from sleep apnea. (*Id.*) Tanvir Syed, M.D., opined that Plaintiff's symptoms were not epilepsy-related and he did not require anti-epileptic medication. (Tr. 841.)  Dr. Syed explained that Plaintiff's vertigo, headaches, and personality changes were likely secondary to head trauma from his car accident "and he will have difficulty returning to work until symptoms resolve." (*Id.*) The doctor recommended that Plaintiff see a vertigo specialist for his dizziness and a psychiatrist to manage his hallucinations. (*Id.*)

In August 2013, Dr. Lerner wrote a letter generally confirming his June 2009 assessment of Plaintiff's physical capacity. (Tr. 817.)  Dr. Lerner indicated that the prior assessment of Plaintiff's condition was based on treatment from December 2006 through November 2008, but he believed that the June 2009 assessment remained accurate. (*Id.*)

### b.  Mental Impairments

In June 2009, Plaintiff treated with neuropsychologist Philip Fastenau, Ph.D., upon Dr. Yasinow's referral. (Tr. 770.)  Plaintiff explained that he had temper issues, talked too loudly, shut down when he sensed aggression, and experienced auditory and olfactory hallucinations. (Tr. 770-71.)  Dr. Fastenau noted that Plaintiff exhibited mild difficulties in psychomotor speed and on some measures of spatial memory. (Tr. 772.) Plaintiff exhibited tremors during the examination that Dr. Fastenau believed may have been due to anxiety and did not appear to be disabling. (*Id.*)  Dr. Fastenau recommended an EEG to rule out the possibility of epilepsy and a psychology consult.

6

(*Id.*)

In August 2009, psychiatrist Susan Stagno, M.D., saw Plaintiff for mood and unusual sensory experiences on a referral from Dr. Fastenau. (Tr. 778.)  Plaintiff appeared cognitively in tact, and his affect was euthymic, although somewhat blunted. (*Id.*)  His speech was normal. (*Id.*)  Testing showed that Plaintiff had some mild difficulties with psychomotor speed in his dominant hand and some deficits in spatial memory. (*Id.*)  Plaintiff's EEG was normal. (*Id.*)  Dr. Stagno diagnosed mood disorder secondary to traumatic head injury and recommended adjusting Plaintiff's antidepressant. (*Id.*)

Plaintiff returned to Dr. Stagno on September 10, 2009, and reported a recent physical altercation with his brother-in-law. (Tr. 849.)  Plaintiff's affect was somewhat blunted and he had a mild hand tremor. (*Id.*)  Approximately one year later, in October 2010, Plaintiff returned to Dr. Stagno to follow up on his epilepsy monitoring. (Tr. 850.) Dr. Stagno noted that seizures had been ruled out and there were no other findings that suggested a treatable cause for his symptoms. (*Id.*)  Plaintiff had a serious affect and appeared sad at times. (*Id.*)  Dr. Stagno observed no gross cognitive issues and no abnormal movements. (*Id.*)  She described Plaintiff as reflective and insightful. (*Id.*) Plaintiff described visual hallucinations and depression caused by his inability to make a financial contribution to his family. (*Id.*)  Dr. Stagno discussed changing Plaintiff's antidepressant medication, but Plaintiff declined. (*Id.*)

In January 2011, neuropsychologist Cynthia Griggins, Ph.D., wrote a letter stating that she first saw Plaintiff in November 2010 and treated him for several

sessions. (Tr. 843-45.)  Plaintiff reported difficulty focusing after his head injury and was forced to shutdown the business he had run for a number of years. (Tr. 843.)  Plaintiff was unemployed for sometime thereafter, but eventually obtained a sales position at Home Depot. (Tr. 844.)  While at Home Depot, he was reprimanded on several occasions for inappropriate interactions with coworkers and supervisors. (*Id.*) For example, Plaintiff spoke to coworkers in a voice that was inappropriately loud and aggressive. (*Id.*)  Plaintiff attempted independent contract work as a landscaper but was unable to properly calculate expenses and his business failed. (*Id.*)  Dr. Griggins explained that individuals who have suffered brain injuries may recover to the point where they do not exhibit cognitive deficits on formal testing, but display a pattern of personality problems, such as irritability, a "short fuse," decreased ability to regulate emotions, a lack of self-awareness, and poor judgment in business matters and social situations. (Tr. 844.)  She further explained that many individual recover to the point where they can perform repetitive jobs, or work under close supervision, but cannot independently problem solve, work as managers, or run businesses. (Tr. 844-45.)  Dr. Griggins opined that Plaintiff's problems were likely the result of a history of brain injury. (Tr. 845.)  She concluded that individuals like Plaintiff could not function in executive or managerial positions because of poor organizational and planning skills and poor judgment. (*Id.*)  They could usually perform lower-level jobs, unless their changes in emotional regulation caused inappropriate social interactions, which may well have occurred with Plaintiff at Home Depot. (*Id.*)

2.    **Agency Reports**

a. **Physical Impairments**

On March 3, 2007 consultative physician Eulogio Sioson, M.D., examined Plaintiff and assessed his physical abilities. (Tr. 579-80.)  Plaintiff reported that his medical problems included a head injury, hypertension, and depression. (*Id.*)  He denied any problem walking, climbing, standing, and sitting. (*Id.*) When he experienced an episode of vertigo, he would momentarily lose his balance. (*Id.*)  On examination, Plaintiff had minimal ankle tenderness, but otherwise his physical examination was largely normal, including a normal gait and no tenderness in his neck, back, or joints. (Tr. 580.)  Plaintiff had no sensory deficits and was able to perform "finger to nose" and alternating movements, but lost his balance on Romber's testing. (*Id.*) Plaintiff had no vertigo with head movements or nystagmus, but had double vision during finger testing. (*Id.*)  Plaintiff was able to name the last three presidents and could perform simple calculations. (*Id.*)  He could not recall any of four objects after a few minutes. (*Id.*)  Dr. Sioson opined that Plaintiff had no apparent motor, sensory, or gross coordination deficit due to his traumatic brain injury, although Plaintiff appeared to have a problem with immediate recall. (*Id.*)  The doctor concluded that aside from the findings in his report, neuromusculoskeletal data showed no other objective findings that would affect work-related activities such as walking, climbing, standing, carrying, lifting, handling, sitting, and traveling. (*Id.*)

On March 12, 2007, Teresita Cruz, M.D., reviewed the record and provided a physical capacity assessment. (Tr. 582-89.)  Dr. Cruz opined that Plaintiff could lift up to

9

50 pounds occasionally and 25 pounds frequently, as well as stand, walk, or sit for up to six hours in an eight-hour workday. (Tr. 583.)  Plaintiff could frequently stoop and never climb ladders, ropes, or scaffolds. (Tr. 584.)  He needed to avoid all exposure to hazards. (Tr. 586.)

In March 2010, Willa Caldwell, M.D., conducted a second review of the record. (Tr. 833-40.)   Dr. Caldwell mostly affirmed Dr. Cruz's opinion, except that she found Plaintiff did not need to avoid exposure to hazards. (Tr. 837.)

### b. Mental Impairments

On January 18, 2007, psychologist Herschel Pickholtz, Ed.D., examined Plaintiff and evaluated his mental status. (Tr. 551-55.)  Plaintiff was taking an anti-depressant medication, but did not attend counseling, aside from seeing a neurologist. (Tr. 554.) Plaintiff complained of personality changes and difficulties dealing with pressure and confrontation, which caused him to lose his last job. (*Id.*)  On mental status examination, Plaintiff had mild limitations and deterioration relative to short-term and immediate recall. (*Id.*)  Dr. Pickholtz opined that Plaintiff's ability to relate to coworkers and others was moderately impaired as a result of his change in personality and tendencies to avoid potential difficulties. (Tr. 555.)  Plaintiff's thinking and memory were mildly impaired due to an apparent problem with short-term memory. (*Id.*)  Plaintiff's ability to handle work activities relative to speed, consistency, and reliability was moderately impaired. (*Id.*)

In February 2007, Tonnie Hoyle, Psy.D., reviewed the record to assess Plaintiff's mental limitations. (Tr. 570-72.)  Dr. Hoyle noted that Plaintiff was moderately limited in

10

his ability to understand, remember, and carry out detailed instructions; maintain

attention and concentration for extended periods; work in coordination with or proximity

to others without being distracted; complete a normal workday and workweek without

interruptions from psychologically based symptoms; interact appropriately with the

general public; accept instructions and respond appropriately to criticism from

supervisors; and get along with coworkers or peers. (Tr. 570-71.)  Plaintiff's abilities

were otherwise unimpaired.  In terms of daily activities, Plaintiff worked around the

house, cared for his personal needs without assistance, went grocery shopping, and did

some volunteer work. (Tr. 572.)  Dr. Hoyle concluded that Plaintiff could perform work

where he did not have to "closely relate to others in an environment that is relatively

static." (*Id.*)

   In September 2009, Bruce Goldsmith, Ph.D., reviewed the record and assessed

Plaintiff's mental abilities. (Tr. 805-07.)  Dr. Goldsmith found that Plaintiff was

moderately limited in his ability to carry out detailed instructions, maintain attention and

concentration for extended periods, complete a normal workday and workweek without

interruptions from psychologically based symptoms and perform at a consistent pace

without an unreasonable number and length of rest periods, interact appropriately with

the public, ask simple questions or request assistance, accept instructions and respond

appropriately to criticism from supervisors, and respond appropriately to changes in the

work setting. (Tr. 805-06.)  Dr. Goldsmith noted that Plaintiff's daily activities included

driving his son to school, using the Internet to check his stocks, and completing laundry,

as well as other chores. (Tr. 807.)  Plaintiff went to the grocery store twice a week,

cooked daily, watched the news regularly, and cared for his dog. (*Id.*)  He occasionally

saw friends, neighbors, and family members, and also volunteered. (*Id.*)  Dr. Goldsmith

opined that Plaintiff's ability to relate to others, withstand the pressures of work, and

maintain concentration, persistence, and pace were moderately impaired. (*Id.*)

Plaintiff's ability to understand and remember directions was mildly impaired. (*Id.*)  In

the RFC, Dr. Goldsmith concluded that Plaintiff could perform simple, repetitive tasks in

a situation where duties were relatively static and changes could be explained. (*Id.*)

Plaintiff could occasionally interact with others on a superficial level. (*Id.*)

On February 12, 2010, Patricia Semmelman, Ph.D., reviewed the record and

affirmed Dr. Goldsmith's opinion. (Tr. 832.)

**C.    Hearing Testimony**

**1.    Plaintiff's Hearing Testimony**

At the administrative hearing held in September 2013, Plaintiff testified that he

was unable to work due to the combined effects of PTSD and his brain injury. (Tr. 85.)

Following the 1992 assault, Plaintiff was unable to concentrate and was forced to shut

down the business he had managed. (Tr. 86-89.)  Plaintiff also suffered from changes

in his personality, irritability, and vertigo. (Tr. 89-90.)  Prozac somewhat relieved

Plaintiff's symptoms, but he still found himself suffering from symptoms characteristic of

Tourette syndrome. (Tr. 91-92.)  For example, Plaintiff had once cursed at a former

manager and had no recollection of doing so after it happened. (Tr. 92-93.)

At some point after the 1992 accident, Plaintiff began to suffer from migraines

three to four times a week. (Tr. 104.)  Although medication was unhelpful, reclining in a

dark room for thirty to forty-five minutes generally would provide complete relief. (*Id.*)

12

Plaintiff also developed a tremor that affected both hands, but predominantly his dominant hand. (Tr. 105.)  Plaintiff experienced vertigo episodes that could last up to one hour and sometimes caused Plaintiff to stumble, lose his balance, or fall. (Tr. 108-09.)  Friends would comment that Plaintiff was short-tempered. (Tr. 112.)  Plaintiff struggled with long and short-term memory and became fatigued when he tried to maintain focus. (Tr. 113-14.)

### 2.    Vocational Expert's Hearing Testimony

Brad Stalkin, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 118-19.)  The individual could perform work at the medium level, lifting up to 50 pounds occasionally and up to 25 pounds frequently and standing, walking, or sitting up to six hours. (Tr. 119.)  The individual could occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds. (*Id.*)  The individual must avoid all exposure to hazardous machinery, unprotected heights, and commercial driving. (*Id.*)  He was limited to low stress tasks defined as tasks that do not require high production quotas, strict time requirements, work that is paid at a piece rate, or work that involves arbitration, negotiation, or confrontation. (*Id.*) The individual is precluded from directing the work of others or being responsible for the safety of others and is limited to superficial interaction with coworkers and the public such as interaction which is of a brief duration and for a specific purpose. (Tr. 119-20.)  The individual would be off task five percent of the time. (Tr. 121.)  The VE testified that the individual would be able to perform such jobs as a grocery bagger, dishwasher, and cleaner. (Tr. 120-21.)

13

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and*

14

416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her

past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

prevent her from doing his past relevant work, if other work exists in the national

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§

404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirement of the Social Security Act on December 31, 2009.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 11, 2004, through his date last insured of December 31, 2009.

3.  Through the date last insured the claimant had the following severe impairments: cervical and thoracic degenerative changes and disc bulge, post concussive syndrome with chronic recurrent vertigo, labyrinthitis and headaches, obesity, depression, and anxiety/post-traumatic stress disorder.

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R.404.1567(c) with lifting up to 50 pounds occasionally and up to 25 pounds frequently, standing and/or walking six hours and sitting for six hours in an eight hour workday with normal breaks; occasionally climbing ramps and stairs, never climbing ladders, ropes, or scaffolds; avoiding all exposure to hazardous machinery, unprotected heights, and commercial driving; limited to non-complex tasks such as tasks which can be learned within 30 days; limited to low stress tasks defined as tasks that do not require high production quotas, strict time

15

requirements, work that is paid at a piece rate or that involves arbitration, negotiation, or confrontation; the claimant is precluded from directing the work of others or being responsible for the safety of others; the claimant is limited to superficial interaction with coworkers and the public such as interaction which is of a brief duration and for a specific purpose; and the claimant will be off task five percent of the time.

6.    Through the date last insured, the claimant was unable to perform any past relevant work.

7.    The claimant was born on April 18, 1950, and was 53 years old, which is defined as an individual closely approaching advanced age, on his alleged onset date.    The claimant subsequently changed age category to advanced age.

8.    The claimant has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from January 11, 2004, the alleged onset date, through December 31, 2009, the date last insured.

(Tr. 49-57.)

## V.  LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

16

(6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.**     **Plaintiff's Assignments of Error**

> **1.**     **The ALJ's Treating Source Analysis and Reliance on Review Physicians and Psychologists' Opinions**

Plaintiff maintains that the ALJ erred in assigning less than controlling weight to the opinions of Drs. Lerner, Syed, and Griggins, Plaintiff's treating physicians.  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v.*

17

*Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. §
404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may
be given little weight if it is unsupported by sufficient clinical findings and is inconsistent
with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).
If an ALJ decides to give a treating source's opinion less than controlling weight, he
must give "good reasons" for doing so that are sufficiently specific to make clear to any
subsequent reviewers the weight given to the treating physician's opinion and the
reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL
374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by
the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and
its purpose is to "let claimants understand the disposition of their cases" and to allow for
"meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation
marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating
physician's opinion less than controlling weight, the error is not harmless and the
appropriate remedy is remand.  *Id.*

### a. Dr. Lerner

The ALJ declined to give controlling weight to Dr. Lerner's June 2009 and
August 2013 opinions, explaining:

> Less weight is given to the opinion of Dr. Lerner who
> completed a questionnaire on June 2, 2009, and indicated that
> the claimant can sit for three hours in an eight hour workday
> and stand and [walk] for one hour and must get up and move
> around every 15 minutes.  Furthermore, he concluded that the
> claimant would likely miss one day of work per month.  Such
> an opinion is not supported by the objective medical evidence,
> which shows relatively normal findings, or the claimant's

18

functioning, as discussed in detail above.  Similarly, less weight is given to Dr. Lerner's opinion dated August 6, 2013, where he also indicated that the claimant could sit for three hours in an eight [hour] workday and stand and [walk] for one hour and must get up and move around every 15 minutes. (Tr. 55.)

The ALJ did not err in declining to assign controlling weight to Dr. Lerner's opinion, because he gave "good reasons" for doing so and the following substantial evidence supports that conclusion:

- During various physical examinations, Plaintiff had normal muscle strength with no muscle atrophy, no sensory deficits, and a normal gait. (Tr. 53.)

- During a consultative examination with Dr. Sioson, Plaintiff had no vertigo with head movements. (*Id.*)  Dr. Sioson concluded that Plaintiff had a history of traumatic brain injury with a problem with immediate recall, depression, hypertension, and obesity with MBI of 43.  He noted that except for these findings, the examination showed no other objective findings that would affect work-related activities such as walking, climbing, standing, carrying, lifting, handling, sitting, and traveling. (*Id.*)

- An emergency room record indicated that Plaintiff had "fairly good" results from physical therapy and his vertigo had improved and stabilized. (*Id.*)

- During hospital monitoring for epilepsy, Plaintiff's neurological evaluation was normal, aside from mild weakness in his left hip flexor. (*Id.*)

- Plaintiff engaged in a range of daily living activities, including caring for his personal hygiene, cooking, vacuuming, sweeping, mopping, shopping, watching the news, using a computer, checking stocks on the Internet, driving his son to school, raising chickens, and caring for a dog. (Tr. 54.)

Thus, the ALJ considered the record as a whole, including the results of physical examinations and Plaintiff's ability to function as reflected in his daily activities.  Based on

19

this evidence the ALJ reasonably concluded that Plaintiff was not as severely limited as Dr. Lerner opined.  Plaintiff has failed to demonstrate that the ALJ did not provide good reasons for discounting Dr. Lerner's opinion.  Because the ALJ's reasons "permit[] . . . a clear understanding of the reasons for the weight given" to Dr. Lerner's opinion, *see Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010), and are substantially supported by the record, the ALJ's decision satisfies the purposes of the controlling physician rule and, thus, provides no basis for remand.

### b.  Dr. Syed

Dr. Syed opined that Plaintiff's vertigo, headache, and personality changes were likely secondary to head trauma from his accident, and that Plaintiff "will have difficulty returning to work until symptoms resolve." (Tr. 841.)  The ALJ attributed "less weight" to Dr. Syed's opinion, explaining that the determination regarding an individual's ability to work was a decision reserved to the ALJ. (Tr. 55.)

It is well established that a treating physician's opinion is only entitled to special attention and deference when it is a "medical opinion."  *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).  Opinions on issues reserved to the Commissioner–such as whether the claimant is "disabled" or "unable to work"–are not medical opinions, nor deserving of any particular weight. *Id.* (citing 20 C.F.R. §§ 404.1527(e), 416.927(e)).  Here, Dr. Syed opined that Plaintiff would have difficulty returning to work, but assessed no further functional limitations.  The ALJ correctly observed that Dr. Syed's opinion was not a medical opinion, and thus, not entitled to deference.  Accordingly, the ALJ provided good reason for his

20

decision to discount Dr. Syed's opinion and his analysis comports with the treating source rule.

### c. Dr. Griggins

The ALJ also gave "less weight" to Dr. Griggins' January 2011 opinion, explaining:

> [Dr. Griggins] indicated that individuals like the claimant cannot function in executive or managerial positions because of their poor organization, planning, and judgment, but that he can perform lower level jobs unless his change in emotional regulation causes inappropriate social interactions. While this opinion is mostly consistent with the record, it is based on the claimant's subjective complaints and, as noted above, the determination regarding an individual's ability to work is reserved for the Commissioner. Furthermore, this opinion was written more than one year after the claimant's date last insured and therefore, does not necessarily evaluate the period of time in question. (Tr. 55.)

It is a close call whether the three reasons the ALJ provided for discounting Dr. Griggins' opinion fulfill the mandates of the treating source rule. First, it is not clear that Dr. Griggins based her opinion on only Plaintiff's subjective complaints. In her letter, Dr. Griggins indicated that she considered Dr. Fastenau's findings when formulating her opinion as well as Plaintiff's statements. (Tr. 845.) Second, Dr. Griggins' opinion arguably constitutes a medical opinion, as the psychologist went beyond stating whether Plaintiff could work to explain that Plaintiff would be unable to serve in an executive or management capacity. Finally, while Dr. Griggins issued her opinion after Plaintiff's date last insured, Dr. Griggins also discussed much of Plaintiff's behavior prior to the date last insured and reviewed his treatment with Dr. Fastenau, which occurred during the relevant period. As a result, Dr. Griggins' opinion may be relevant, at least to some degree, to Plaintiff's condition prior to the date last insured.

21

Nevertheless, even if the reasons the ALJ gave for giving Dr. Griggins' opinion less weight were not good reasons, remand would not be necessary.  If an ALJ does not give good reasons for rejecting the opinion of a treating source, reversal and remand may not be required if the violation is *de minimis. Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462 (6th Cir. 2005) (citing *Wilson*, 378 F.3d at 547).  One example of a *de minimis* violation is where the Commissioner makes findings consistent with the treating source's opinion. *Friend*, 375 F. App'x at 551 (quoting *Wilson*, 378 F.3d at 547).  Here, the ALJ's RFC is consistent with Dr. Griggins' opinion.  The RFC precludes Plaintiff from directing the work of others or being responsible for the safety of others. (Tr. 52.)  The RFC also limits Plaintiff to (1) non-complex tasks that could be learned within 30 days, (2) low stress tasks, defined as tasks that do not require high production quotas, strict time requirements, work that is paid at a piece rate, or work that involves arbitration, negotiation, or confrontation, and (3) superficial interactions with coworkers and the public, such as interaction which is of brief duration and for a specific purpose. (*Id.*) Plaintiff has not demonstrated how the RFC fails to accommodate Dr. Griggins' opinion. Accordingly, because Dr. Griggins' opinion is consistent with the RFC, any error by the ALJ in failing to provided good reasons for discounting the opinion does not constitute reversible error.

### d.  State Agency Reviewing Physicians and Psychologists

Plaintiff also contends that the ALJ improperly assigned great weight to the opinions of the reviewing state agency medical sources–Drs. Cruz, Caldwell, Hoyle, and Goldsmith–over the opinions of his treating sources.  Plaintiff contends that the ALJ

erred in relying on these medical sources because the record was not complete at the time they rendered their opinions.  Specifically, Plaintiff argues that the state agency reviewers did not consider "any evidence submitted after December 2008,"[1] such as "neuropsychology testing, psychological testing, neurological testing, and treatment records."[2] (Pl.'s Brief at 18.)  For the reasons that follow, Plaintiff's argument lacks merit.

Plaintiff has provided no legal support for his argument that the ALJ could not properly rely on the opinions of the state agency reviewing physicians and psychologists because the record was not complete at the time they rendered their opinions.[3]  Indeed, the only legal theory Plaintiff provides in support of his first assignment of error is the treating physician rule, which states that the opinions of treating sources are entitled to controlling weight unless the ALJ provides "good reasons" for rejecting them. (Pl.'s Br. 16-22.)  Here, as discussed in detail above, the ALJ adequately explained his rationale for affording less weight to Drs. Lerner and Syed's opinions regarding Plaintiff's physical RFC.  In addition, any error with regard to the ALJ's analysis of Dr. Griggins' opinion is harmless as Plaintiff's RFC comports with Dr. Griggins' conclusions.  Thus, it is of no

---

[1]    Plaintiff's statement that the state agency reviewing physicians and psychologists did not consider evidence after December 2008 is incorrect. Dr. Caldwell issued his physical RFC in March 2010 (Tr. 837.) and Dr. Semmelman issued her mental RFC in February 2010. (Tr. 832.) Thus, these physicians reviewed evidence in the record well after 2008.

[2]    Contrary to this Court's Initial Order (see Doc. No. 5), Plaintiff did not provide citations to the records in the 877-page Administrative Transcript that the state agency physicians allegedly failed to consider.  This argument can be dismissed on this ground alone.

[3]    The Court declines to engage sua sponte in the complex analysis that this issue requires.

consequence that the state agency reviewing sources may not have had an opportunity to review the entire record, including all treating source opinions,[4] before completing their functional capacity evaluations.[5]  The ALJ had the responsibility of determining Plaintiff's RFC and considered the opinions of treating sources, non-treating but examining sources, non-examining state agency sources, and all of the evidence in the record.  As the ALJ provided an adequate analysis of the RFC opinions of Plaintiff's treating sources and articulated his reasons for assigning less than controlling weight to those opinions, or otherwise made findings consistent with them, this Court is not faced with the concern that a treating source's opinion was unfairly discounted or ignored altogether.  Accordingly, the ALJ's reliance on state agency sources is supported by substantial evidence notwithstanding Plaintiff's unsupported assertion that they did not consider the entire record when issuing their opinions.[6]

---

[4]     The RFC opinions of treating sources are often rendered after a claimant's case has been heard and the medical records have been considered.  Thus, to require state agency physicians to have reviewed these opinions would be impractical, unworkable, and inefficient.  To hold that an ALJ errs by relying on the opinion of a state agency physician who did not have an opportunity to review the RFC opinions of treating sources would allow plaintiffs in future cases to routinely obtain RFC assessments from treating sources after the agency experts have reviewed the record in a case, thereby undermining the opinions of the consultative examiners.

[5]     Additionally, Plaintiff asserts that the reviewing physicians and psychologists ought to have addressed significant findings by various treating physicians and specialists in their reports.  Plaintiff has provided no legal support for this argument.

[6]     As Plaintiff has not provided transcript citations for the other evidence that the state agency reviewing physicians and psychologists did not have the benefit of assessing before rendering their opinions, this Court cannot adequately address whether this additional evidence renders the state agency opinions stale.

## 2.  The RFC

Plaintiff argues that the ALJ failed to accommodate the social interaction limitations Drs. Hoyle and Goldsmith recommended in the RFC and failed to explain why such limitations were rejected.  More specifically, Plaintiff contends that the ALJ failed to account for the state agency reviewers' findings that he was moderately limited in his ability to (1) work in coordination with or proximity to others without being distracted, (2) complete a workday or workweek without interruptions from psychologically based symptoms, (3) accept instructions and respond appropriately to criticism from supervisors, and (4) get along with coworkers and peers.  The Commissioner contends that the ALJ adequately accounted for Plaintiff's limitations in the RFC.

The limitations Plaintiff asserts that the ALJ failed to include in the RFC were described in Section I of the state agency reviewers' Mental Residual Functional Capacity Assessment ("MRFCA").  This Court has acknowledged that Section I of the MRFCA is merely a worksheet and does not constitute the state agency physician's RFC. *See Earls v. Comm'r of Soc. Sec.*, No. 1:09-CV-1465, 2011 WL 3652435, at *5 (N.D. Ohio Aug. 19, 2011) (Wells, J.); *Velez v. Comm'r of Soc. Sec.*, No. 1:09-CV-715, 2010 WL 1487599, *6 (N.D. Ohio Mar. 26, 2010) (Gallas, M.J.).  In general, the ALJ is not required to include the findings in Section I in formulating the claimant's RFC. *Id.*  It is in Section III of MRFCA that the reviewing physician's actual mental RFC assessment is recorded. *Id.*  Accordingly, the ALJ was not required to include the findings in Section I of Drs. Hoyle and Goldsmith's MRFCA in Plaintiff's RFC or discuss why he did not adopt these limitations.  Plaintiff has not otherwise established that the ALJ erred in

25

regard to his analysis of Drs. Hoyle and Goldsmith's opinions.[7]

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: January 26, 2016

---

[7]     Defendant argues that the ALJ adequately accounted for the social interaction limitations the state agency psychologists included in their RFC opinions.  The Court will not address this argument further as this opinion disposes of Plaintiff's allegation of error.